# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

|  |  |  |
|---|---|---|
| | : | |
| VISUAL INTERACTIVE PHONE | : | |
| CONCEPTS, INC., | : | |
| | : | |
| *Plaintiff,* | : | <u>Document Electronically Filed</u> |
| | : | |
| v. | : | |
| | : | |
| VIRGIN MOBILE USA, LLC, | : | |
| *Defendant.* | : | CIVIL ACTION NO. 05-2661 (MLC) |
| | : | |
| | : | |
| VIRGIN MOBILE USA, LLC, | : | |
| *Counterclaim-Plaintiff,* | : | Oral Argument Requested |
| | : | |
| v. | : | |
| | : | |
| VISUAL INTERACTIVE PHONE | : | |
| CONCEPTS, INC., | : | |
| *Counterclaim-Defendant.* | : | |

_____

_____

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON BEHALF OF VIRGIN MOBILE USA, LLC
_____

# TABLE OF CONTENTS

Page

I.      Preliminary Statement ..................................................................................1

II.     Procedural and Factual Background ............................................................3

III.    Judicial Estoppel Compels Dismissal of This Action And Bars VIPC
        From Contesting Its Lack of Standing ........................................................8

        A.      Legal Standards For Judicial Estoppel ..............................................8

        B.      VIPC Has Advanced Two Irreconcilably Inconsistent Positions .......11

        C.      VIPC Has Acted In Bad Faith ..........................................................13

        D.      No Lesser Sanction Than Summary Judgment Would Right the
                Wrongs VIPC Has Committed ..........................................................15

        E.      VIPC's Conduct is Not Excused By the State Court Findings ...........16

IV.     No Preclusive Effect Should Be Afforded to the New York Action ............16

        A.      Legal Standards For Determining Preclusive Effect of A Prior
                Judgment ..........................................................................................17

        B.      The State Court Judgment Is Entitled to No Preclusive Effect In
                This Court..........................................................................................18

                1.      VMU Did Not Have a "Full And Fair Opportunity" To
                        Litigate The Issues In The New York Action ...........................18

                        a.      Default Judgments Are Not Entitled To Preclusive
                                Effect ...........................................................................18

                        b.      The Judgment Of The Damages Inquest Is Not
                                Entitled To  Preclusive Effect .......................................19

                        c.      VMU Had No Opportunity To Contest The State
                                Court Judgment.............................................................24

                2.      The Issues In The New York Action Are Not Identical
                        To Those in This Action ........................................................25

i

V.      VIPC Lacks Standing To Assert This Action Against VMU ....................... 27

        A.      Legal Standard For Determining Standing ........................................ 27

        B.      The Exclusive Agreement Deprives VIPC Of Standing ................... 30

        C.      The Exclusive Agreement Is Valid .................................................... 31

                1.      Anthony Cinotti Had Full Authority To Enter the
                        Exclusive Agreement .............................................. 32

                        i.      Mr. Cinotti Was VIPC's Secretary and
                                Treasurer ........................................... 33

                        ii.     Mr. Cinotti Was Co-Chairman Of VIPC's
                                Board of Directors ............................... 34

                        iii.    Mr. Cinotti Had Extensive Prior Dealings
                                With Handtrade And Other Entities ................... 35

                2.      VIPC Ratified The Exclusive Agreement ................................ 37

VI.     Whatever the Effect of the New York Judgment, It Cannot Confer
        Standing ....................................................................................... 38

        CONCLUSION ................................................................................ 40

# TABLE OF AUTHORITIES

## CASES

*AFN, Inc. v. Schlott, Inc.*, 798 F. Supp. 219 (D.N.J. 1992) ..................passim

*American Express Co. v. Lopez*, 340 N.Y.S.2d 82 (Civ. Ct. 1973) .............34

*Ballentine v. United States*, 486 F.3d 806 (3d Cir. 2007) .....................27, 28

*Baxter v. Fulton Ice & Cube Co.*, 484 N.Y.S.2d 835
    (App. Div. 1985)................................................................................21, 23

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................28

*Chambers v. City of New York*, 764 N.Y.S.2d 708 (App. Div. 2003) ..........18

*Chemical Bank Affiliated FM Insurance Co.*, 196 F.3d 373
    (2d Cir. 1999) .................................................................................36, 37

*Delgrosso v. Spang & Co.*, 903 F.2d 234 (3d Cir. 1990) ..............................8

*Elk Grove Unified School District v. Newow*, 542 U.S. 1 (2004)................28

*Ernst v. Cary Safe Co.*, 185 N.Y.S. 168 (Sup. Ct. 1920) .......................35, 36

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) .................................28

*Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*,
    93 F.3d 774 ...........................................................................................39

*Gramatan Home Investors Corp. v. Lopez*,
    386 N.E.2d 1328 (N.Y. 1979) ...................................................17, 18, 25

*Hallock v. State*, 474 N.E.2d 1178 (N.Y. 1984) .........................................35

*Hubbard v. Syenite Trap Rock Co.*, 165 N.Y.S. 486
    (App. Div. 1917)...............................................................................35, 36

*Irving Trust Co. v. Townsend*, 65 F.2d 406 (2d Cir. 1933) ....................26, 37

*Jourdan v. Long Island R.R. Co.*, 22 N.E. 153 (N.Y. 1889)..................26, 37

*Kremer v. Chemical Construction Corp.*, 456 U.S. 461 (1982) ..................17

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314 (3d Cir. 2003) ........................................................9

*Lans v. Digital Equipment Corp.*, 252 F.3d 1320 (Fed. Cir. 2001)........27, 28

*Lewandowski v. National R.R. Passenger Corp.*, 882 F.2d 815 (3d Cir. 1989) ......................................................................................9, 10

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)...........................28, 30

*Minneapolis & St. Louis R.R. Co. v. Peoria & Pekin Union Railway Co.*, 270 U.S. 580 (1926) .......................................................................39

*Monterey Dev. Corp. v. Lawyer's Title Ins. Corp.*, 4 F.3d 605, 609 (8th Cir. 1993)............................................................9

*Mulitex USA, Inc. v. Marvin Knitting Mills, Inc.*, 784 N.Y.S.2d 506, 507 (App. Div. 2004)..........................................37

*Odell v. 704 Broadway Condominium*, 728 N.Y.S.2d 464 (App. Div. 2001)...................................................................................32

*Patriot Cinemas, Inc. v. General Cinemas Corp.*, 834 F.2d 208 (1st Cir. 1987)...................................................................................11

*Robbins v. Michigan Millers Mutual Insurance Co.*, 653 N.Y.S.2d 975 (App. Div. 1997)................................................20, 21

*Rourke v. Travelers Insurance Co.*, 678 N.Y.S.2d 195 (App. Div. 1998)...............................................................................18, 19

*In re Salem*, 290 B.R. 479 (S.D.N.Y. 2003) ................................................18

*Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510 (3d Cir. 1953) ...........................................................................7, 8, 10

*Traitel Marble Co. v. Brown Bros., Inc.*, 144 N.Y.S. 562
    (App. Div. 1913)..................................................................................33

*Trimline Window Frame Inc. v. Rural New Yorker, Inc.*,
    168 N.Y.S.2d 170 (Sup. Ct. 1957) .........................................................33

*United States v. DiPaolo*, 466 F. Supp. 2d 476 (S.D.N.Y. 2006)................18

*United States v. McCaskey*, 9 F.3d 368 (5th Cir. 1993) ...............................8

*United Virginia Bank/Seaboard Nat. v. B.F. Saul
Real Estate Inv. Trust*, 641 F.2d 185 (4th Cir. 1981)....................................9

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
    944 F.2d 870 (Fed. Cir. 1991) .......................................................29, 30

*Wade v. Woodings-Verona Tool Works, Inc.*, 469 F. Supp. 465
    (W.D. Pa. 1979)..................................................................................10

*Warth v. Seldin*, 422 U.S. 490 (1975)..........................................................27

*Watrous v. Autera*, 726 N.Y.S.2d 595 (App. Div. 2001) ............................18

## STATUTES/RULES

35 U.S.C. § 285 .............................................................................................1

Fed. R. Civ. P. 12(b)(1)...........................................................................1, 27

Fed. R. Civ. P. 12(h)(3)................................................................................27

Fed. R. Civ. P. 56.........................................................................................1

## OTHER SOURCES

18 James Wm. Moore et al., *Moore's Federal Practice*
    § 134.30 (3d ed. 2007) ............................................................................9

57 N.Y. Jur. 2d Estoppel, Ratification, & Waiver § 76 (1986) ....................9

v

## I.        PRELIMINARY STATEMENT

Pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 56, Virgin Mobile USA, L.P., formerly known as Virgin Mobile USA, LLC, ("VMU") respectfully submits this memorandum in support of its Motion for Summary Judgment Based Upon Judicial Estoppel and Lack of Standing.  This is a patent infringement suit brought by Visual Interactive Phone Concepts, Inc. ("VIPC") against VMU.  As is demonstrated herein, VIPC lacked jurisdictional standing to bring and maintain this action.  Aside from its standing defects, VIPC has engaged in an unrelenting series of diversionary and dishonest tactics, which represent a bold assault on judicial integrity, and which should judicially estop VIPC from continuing this action.  VMU therefore respectfully requests that this Court dismiss VIPC's Complaint with prejudice, declare this an exceptional case pursuant to 35 U.S.C. § 285, and award VMU its reasonable attorneys' fees and costs.

VIPC's conduct in this litigation has been nothing short of shocking. More than a year ago, only through diligent third-party discovery, VMU learned of the existence of an Exclusive Agreement that expressly deprives VIPC of the right to assert this action.  Moreover, only through diligent investigation, VMU uncovered a concurrent state court action that VIPC initiated regarding the Exclusive Agreement.  Despite its clear obligations, VIPC concealed the Exclusive Agreement and failed to inform this Court about the state court action.  Rather than

1

confront the consequences of this Agreement, VIPC has chosen to play hide the

ball and weave a web of self-serving contradiction, implicating not only this Court,

but also the New York Supreme Court.  Since this litigation began, VIPC has:

- Concealed the existence of an Exclusive Agreement which unquestionably deprives VIPC of standing to initiate and maintain this action.

- Given false and incomplete responses to interrogatories and discovery requests.

- Violated L. Civ. R. 7.2(a), and intentionally delayed resolution of this motion, by refusing to remove legal arguments from its affidavits and declarations.

- Never informed this Court or VMU that it had initiated a concurrent action involving the Exclusive Agreement.

- Taken diametrically opposed positions in two courts, simultaneously arguing in this Court that the Exclusive Agreement is invalid, and in another court that it is valid and a basis to recover a money judgment.

- Provided false and incomplete sworn testimony.

VIPC's behavior has shown a complete disregard for the obligations and code of

conduct imposed by the Federal Rules of Civil Procedure.  The doctrine of judicial

estoppel was crafted by the Third Circuit to avoid precisely this type of "fast and

loose" conduct.  If any case warrants application of the doctrine, this is it.  Indeed,

this Court has previously considered a virtually identical fact pattern—a litigant

asserted that a license was valid in one judicial forum, while simultaneously

arguing that it was invalid in a different forum—and the Court held that this party

was judicially estopped from asserting that the license agreement was invalid.  *See AFN, Inc. v. Schlott, Inc.*, 798 F. Supp. 219, 227 (D.N.J. 1992).

Additionally, there is another legal basis apart from VIPC's extended pattern of misconduct upon which a dismissal would be proper.  VIPC cannot satisfy the basic standing requirements for asserting an infringement action.  Thus, whether based on the doctrine judicial estoppel, the lack of standing to initiate and maintain this action, or a combination of both, this Court should reject VIPC's fast and loose conduct and dismiss this action with prejudice.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

On May 20, 2005, VIPC filed a Complaint asserting infringement of U.S. Patent No. 5,606,361 (filed May 10, 1995) ("the '361 patent") and U.S. Patent No. 5,724,092 (filed Sept. 12, 1996) ("the '092 patent").  (*See* Docket No. 1.)  On September 29, 2005, VMU served its First Set of Requests for Production of Documents to VIPC, wherein VMU specifically requested "[a]ll documents relating to the ownership, assignment, or other transfer of ownership of the patents-in-suit," as well as "[a]ll documents relating to any offers to license or licenses regarding any of the patents-in-suit."  (Attached as Ex. A, at 8 (Requests Nos. 2 & 3).)  Under the definitions included with the Requests for Production, documents "relating to" the subject matter described in a particular request would include those documents that "deal[] with," "refer[] to," or "mention[]" the relevant subject

3

matter.  (*Id.* at 6.)  Also on September 29, 2005, VMU served its First Set of

Interrogatories to VIPC, asking VIPC to "[i]dentify all license agreements,

settlements, covenants not to sue, and any negotiations thereto, that relate to the

patents-in-suit.  Such identification should include the date and names of the

parties or signatories."  (Attached as Ex. B, at 11.)  On December 29, 2005, VIPC

responded to VMU's interrogatories and requests for production by identifying and

producing only one license agreement: a license between VIPC and

HandTrade.Com, Inc., executed on September 27, 1999.  (*See* Ex. C. at 8.)  VIPC

never amended or supplemented this response.  VMU therefore concluded, based

upon VIPC's affirmative representations and production of documents, that there

was only one license agreement that "deals with," "refers to," or "mentions" the

'361 patent or the '092 patent, *i.e.*, the 1999 Agreement with Handtrade.  However,

VMU later learned that VIPC concealed the existence and terms of an additional

license agreement.

On February 8, 2007, counsel for VMU deposed Anthony J. Cinotti,

who was and remains a Co-Chairman of VIPC's Board of Directors.  In connection

with this deposition, VMU first received a copy of the Amended and Restated

License Agreement and Exclusive License Agreement Between Handtrade.Com,

Inc. and Visual Interactive Phone Concepts, Inc. ("the Exclusive Agreement"),

which was duly executed by Anthony Cinotti on behalf of VIPC on August 10,

2000.  (Attached as Ex. D.)  The Exclusive Agreement not only grants

Handtrade.com, Inc. ("Handtrade") the exclusive right to use the technology

claimed in the patents-in-suit, but also unequivocally divests VIPC of any right to

sue for infringement of the '361 and '092 patents by assigning and transferring to

Handtrade "any and all causes of action, rights, and remedies arising under the

[patents-in-suit]."  (Ex. D, §§ 3 & 4.)  Because the Exclusive Agreement expressly

precludes VIPC from bringing this lawsuit, VMU first filed a motion to dismiss for

lack of standing nearly one year ago, on February 23, 2007.  (Docket No. 21.)

        VIPC opposed this motion to dismiss based solely upon the

argument that the Exclusive Agreement was invalid as a matter of law.  (*See*

Docket No. 37.)  Along with its opposition, VIPC submitted the sworn affidavits of

its counsel, Mr. Mark Hankin, and one of its corporate officers, Mr. John

Davidsohn.  (*See* Docket Nos. 34–36.)  Because these affidavits contained legal

arguments and conclusions, VMU moved to strike those portions of VIPC's filings

that violate L. Civ. R. 7.2(a).  (*See* Docket Nos. 51, 52, 61.)  Although conceding

that its filings violated L. Civ. R. 7.2(a), VIPC opposed VMU's motion and failed

to withdraw or modify its previous filings.  (*See* Docket No. 60.)

        While its first motion to dismiss for lack of standing was pending,

VMU independently learned that VIPC had, without informing VMU or this Court,

initiated a lawsuit against Handtrade in New York Supreme Court ("the New York

Action").  VIPC filed the New York Action despite the fact that any disputes under the Exclusive License Agreement are required to be submitted "to Arbitration in accordance with the applicable Rules of the American Arbitration Association." (Exclusive Agreement § 16.)  In its lawsuit, VIPC affirmatively asserted that not only was the Exclusive Agreement validly "entered into," but that Handtrade had not paid certain royalties that VIPC would be entitled to *if and only if the Exclusive Agreement was valid.*  (Verified Compl. ¶¶ 5–7, 13 (attached as Ex. E).)  On June 1, 2007, VMU informed the Court of VIPC's contradictory state court action, and attached a copy of this Verified Complaint.  (Docket No. 67.)  On August 17, 2007, VIPC received a default judgment against Handtrade, in which the court ordered "judgment against the defendant Handtrade.com Inc., declaring that it has *defaulted under the terms of the Agreement dated August 10, 2000.*  (Order No. 001 (attached as Ex. F) (emphasis added).)  The New York court also ordered that a damages inquest would be conducted before the Honorable Lester Sacks, a New York Judicial Hearing Officer.  (*Id.*)  Two weeks later, on August 31, 2007, this Court stayed the instant action "for ninety days pending the outcome of the New York action," and denied VMU's motion to dismiss without prejudice and with leave to move again at a later date.  (Docket No. 76.)

The following week, on September 4, 2007, VIPC filed its Notice for Inquest, demanding a judgment that the Exclusive Agreement had been breached, a

monetary award in excess of $300,000, an accounting of Handtrade's gross revenues, and royalties of 1% of this gross revenue.  (Attached as Ex. G.)  VIPC thus sought to recover royalties due under the very license that it maintained in this action is invalid.  On October 9, 2007, the Judicial Hearing Officer determined that based solely upon the limited testimony offered at the damages inquest, VIPC had failed to prove its entitlement to damages under the Exclusive Agreement, because no officer with authority had entered the Exclusive Agreement on VIPC's behalf.[1] (*See* Decision & Order (attached as Ex. H).)

On November 14, 2007, based upon the findings of the Judicial Hearing Officer, the New York State court entered a judgment that the Exclusive Agreement was "void as a matter of law as of the date of execution for lack of authority."  (Attached as Ex. I.)  On January 8, 2008, VIPC asked this Court to again place the instant action on the calendar, and argued that as a result of the New York State court judgment, VMU can not rely on the Exclusive Agreement to evidence a lack of standing.  (*See* Docket Nos. 78, 79, & 80.)  VIPC's position on this issue notwithstanding, this Court determined at a telephone conference with the parties that VMU should be permitted to pursue its motion to dismiss.  In

---

[1]   Contrary to these findings, Mr. Anthony Cinotti was authorized by virtue of his corporate position and previous course of dealings to validly enter into the Exclusive Agreement, as is discussed more fully in Section V.C.1, *infra*.

accordance with the Court's order of February 5, 2008 (Docket No. 82), VMU has

therefore filed this motion to dismiss based upon (i) judicial estoppel and (ii)

VIPC's lack of standing.

## III.   JUDICIAL ESTOPPEL COMPELS DISMISSAL OF THIS ACTION AND BARS VIPC FROM CONTESTING ITS LACK OF STANDING

### A.   Legal Standards For Judicial Estoppel

In order to protect judicial integrity, the Third Circuit pioneered the

modern doctrine of judicial estoppel in *Scarano v. Central R. Co. of New Jersey*,

203 F.2d 510 (3d Cir. 1953).  In *Scarano*, the Third Circuit held that "a party to

litigation will not be permitted to assume inconsistent or mutually contradictory

positions with respect to the same matter in the same or a successive series of

suits."  *Id.* at 513 (citations and quotations omitted).  Refusing to tolerate those

who attempt to "'play fast and loose with the courts,'" the Third Circuit envisioned

the doctrine of judicial estoppel as a bulwark against "affront[s] to judicial dignity"

and a check against "obtaining unfair advantage."  *Id.* (citation omitted); *see also*

*Delgrosso v. Spang & Co.*, 903 F.2d 234, 241 (3d Cir. 1990) (stating that unlike

the concept of equitable estoppel, which focuses on the relationship between

parties, judicial estoppel focuses on the relationship between the litigant and the

judicial system, and seeks to preserve the integrity of that system).  Since *Scarano*,

other courts have followed the lead of this jurisdiction.  *See United States v.*

*McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993) (noting that this doctrine protects the

judicial process by "prohibiting parties from deliberately changing positions according to the *exigencies of the moment*") (emphasis added); *United Virginia Bank/Seaboard Nat. v. B.F. Saul Real Estate Inv. Trust*, 641 F.2d 185, 190 (4th Cir. 1981) (citing *Scarano*); *Monterey Dev. Corp. v. Lawyer's Title Ins. Corp.*, 4 F.3d 605, 609 (8th Cir. 1993) (citing *Scarano*); 18 James Wm. Moore et al., *Moore's Federal Practice* § 134.30 (3d ed. 2007) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.").

Judicial estoppel applies to assertions of fact or legal positions taken in pleadings, legal briefs, and arguments. *AFN, Inc.*, 798 F. Supp. at 226 (citing *Hardwick v. Cuomo*, 891 F. 2d 1097, 1105 n.14 (3d Cir. 1989)). An action should be dismissed based on judicial estoppel when three conditions are met: (i) a litigant assumes two irreconcilably inconsistent positions; (ii) the change in position evidences bad faith; and (iii) no lesser sanction would adequately remedy the damage caused by the litigant's misconduct. *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003). In order for judicial estoppel to apply, a party need not be successful in its duplicitous attempt; the assumption of mutually inconsistent positions evidencing bad faith is all that is required. *See AFN, Inc.*, 798 F. Supp. at 227 n.12 ("A party's cavalier switch of position from one case to the next or from one proceeding to the next is inimical to

9

the integrity of the judicial system, *regardless of whether the court affirmatively relies on the representation*.") (emphasis added); *see also Lewandowski v. Nat'l R.R. Passenger Corp.*, 882 F.2d 815, 819 (3d Cir. 1989) (noting that "the critical issue is what the employee *contended* in the underlying proceeding, rather than what the jury found") (emphasis added); *Wade v. Woodings-Verona Tool Works, Inc.*, 469 F. Supp. 465, 466–67 (W.D. Pa. 1979) (dismissing a counterclaim although defendant was not successful in asserting a contrary position).

Third Circuit courts have applied judicial estoppel to dismiss actions involving a variety of circumstances.[2]  *AFN Inc. v. Schlott, Inc.*, offers an example nearly indistinguishable from the matter at hand.  798 F. Supp. 219 (D.N.J. 1992). The plaintiff AFN brought suit in the United States District Court for the District of New Jersey, alleging that defendant Schlott breached the parties' license agreement.  *Id.* at 221.  As a defense, Schlott argued that it could not be liable for breach of the license agreement because this agreement was illegally executed, rendering it invalid.  *Id.* at 221–22.  Schlott had previously sued AFN in New Jersey state court, arguing that it was entitled to more than $260,000 under the very

---

[2]   *See, e.g.*, *Scarano*, 203 F.2d at 511–14 (holding that a plaintiff who sought damages under the Federal Employers' Liability Act on the ground that he was completely incapacitated was barred from later seeking damages after his employer refused to rehire him); *see also Lewandowski*, 882 F.2d at 818–19 (discussing a similar fact pattern and affirming dismissal of a suit based on inconsistent arguments regarding the capacity to work).

same license agreement, meaning that "the *sine qua non* of Schlott's position in the state action [was] that the license agreement was and is a valid and enforceable agreement." *Id.* at 223.  In other words, as VIPC does here, Schlott sought in one court to enforce the very agreement that it simultaneously urged was unenforceable in another court.  Although Schlott argued that judicial estoppel should not apply because it was not successful in its state action, this Court rejected Schlott's argument, noting that the Third Circuit "has clearly indicated that judicial estoppel can be applied in the absence of having successfully maintained the prior position." *Id.* at 226.  Because Schlott "sought court rulings in different fora at the same time on diametrically opposed positions with respect to the validity of Schlott's license agreement with AFN," the Court held that Schlott was judicially estopped from contesting the validity of the agreement.  *Id.* at 227; *see also Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 214 (1st Cir. 1987) ("If parties feel free to select contradictory positions before different tribunals to suit their ends, the integrity and efficacy of the courts will suffer.").

### B.     VIPC Has Advanced Two Irreconcilably Inconsistent Positions

VIPC has simultaneously asserted diametrically opposed positions with respect to the validity of the Exclusive Agreement in the New Jersey Action and the New York Action, in a textbook example of the "fast and loose" conduct that was rejected in *Scarano* and *AFN, Inc.* as illustrated by the table below:

11

| New Jersey Action | New York Action |
|---|---|
| "Accordingly, the Exclusive Agreement signed by Cinotti as Chief Executive Officer/President on **August 10, 2000** was null and void for lack of authority." (Hankin Decl. at ¶ 8, Docket No. 35 (emphasis added))<br><br>"The Exclusive Agreement was invalid as a matter of law."  (Opp. Br. at 3)<br><br>"Cinotti's execution of the Exclusive Agreement was null and void." (Hankin Decl. ¶ 8, Docket No. 35)<br><br>"[C]ontrary to the sworn testimony of Cinotti in the New Jersey Action, his execution of the Exclusive Agreement was a nullity. . . .  [T]he only valid License Agreement at the commencement of this action was the Non-Exclusive Agreement . . . ." (Davidsohn Aff., Docket No. 34, ¶ 49) | "[On] **August 10, 2000**, the parties **entered** the [Exclusive Agreement], wherein the plaintiff V.I.P.C., granted a license to the defendant HANDTRADE for the use of the patents set forth above."  (Ex. E, ¶ 5 (emphasis added)) |
| "[T]he Exclusive Agreement was **never** a valid and **binding** Agreement.  There never was a transfer of any rights under said Agreement." (Opp. Br. at 8 (emphasis added)) | "**Pursuant** to the [Exclusive Agreement] . . . HANDTRADE was **required** to pay royalties . . . to plaintiff V.I.P.C., as consideration for the license to the patents[.]" (Ex. E, ¶ 6 (emphasis added))<br><br>VIPC sought "a judgment requiring an accounting of the defendants [*sic*] books and records for the period of August 10, 2000 through the present to determine gross revenue received under the [Exclusive] Agreement and for judgment for royalties under the [Exclusive] Agreement in an amount of one (1%) percent of all gross revenues, plus accrued interest."  (Ex. G) |

12

VIPC cannot possibly reconcile these two positions—if the Exclusive Agreement was "null and void" as it repeatedly asserts to this Court, then it could not have been "entered by the parties." If the Exclusive Agreement was never "valid and binding," then Handtrade would not have received a "license" to the patents-in-suit that "required" the payment of royalties. Its two positions—that the Exclusive Agreement was not a license at all (because the VIPC signatory lacked authority) and that the same agreement entitles VIPC to royalty payments—are diametrically opposed. *See AFN Inc.*, 798 F. Supp. at 227 (noting that once Schlott "exhorted" the state court to rule in its favor based on the validity of a license agreement, it could not be permitted to "simultaneously assert[] the invalidity of that agreement").

### C.   VIPC Has Acted In Bad Faith

A litigant acts in bad faith when it plays "fast and loose with the courts." *See Scarano*, 203 F.2d at 513; *AFN Inc.*, 798 F. Supp at 227 (noting that an attempt to reap monetary benefit under an agreement alleged elsewhere to be invalid is precisely "the type of 'evil the courts should not tolerate'") (citations omitted). There is no other explanation for VIPC's conduct other than that it was acting in bad faith. VIPC filed the New York action on March 11, 2007, roughly two weeks before it would make completely contradictory allegations and arguments in this Court, on March 26, 2007. (*See* Docket No. 37.) Given the

13

proximity of these dates VIPC could not argue that its pleadings in the New York action were the result of a careless or honest mistake.  Long after VMU raised the issue of VIPC's self-serving and contradictory pleadings, VIPC deliberately continued to seek damages under the Exclusive Agreement.  (*See* Ex. G.)  Moreover, VIPC did not inform VMU or this Court of this obviously relevant filing; the first time that this Court learned of the New York Action was when VMU, having conducted its own independent litigation search, discovered it.  (*See* Docket No. 67.)  There is likewise no evidence that the New York Court was aware of VMU's motion to dismiss VIPC's Complaint based in part upon the Exclusive Agreement.  This attempt to keep both courts in the dark certainly gives rise to an inference of bad faith.

VIPC did not alternatively argue in its pleadings to the New York court that the Exclusive Agreement was invalid; instead, its only written statements indicate that it affirmatively asserted the validity of the Exclusive Agreement as the basis for monetary recovery.  And as detailed below in Section IV.B.1.b., *infra*, VIPC presented an incomplete factual record to the New York Court, going so far as to flatly contradict evidence and testimony that had been offered in this case.  These contradictions, coupled with VIPC's attempt to conceal its simultaneous and self-serving litigation, evidences the sort of "fast and loose" conduct that has been held to constitute bad faith.

14

### D.    No Lesser Sanction Than Summary Judgment Would Right the Wrongs VIPC Has Committed

VIPC has cavalierly used the Exclusive Agreement both as a sword and shield—arguing on the one hand that it is entitled to royalty payments, and on the other hand that it was never the basis for any royalty payments because it was never properly executed.  VIPC's conduct presents the quintessential situation which has been held to invoke the doctrine of judicial estoppel.  Although the invocation of this doctrine to dismiss this action is undoubtedly extreme, no lesser sanction would remedy the damage caused by VIPC's conduct.  VMU has incurred substantial costs in connection with its standing motions, but more importantly, in defending a suit that should never have been brought in the first place.  In the New York Action, VIPC asserted that the Exclusive Agreement is valid.  If VIPC is permitted to make such an argument in one court, and then allowed to assert that standing exists because of the *invalidity* of the Exclusive Agreement in this Court, there will be nothing to deter others from making similarly contradictory arguments so as to gain an unfair advantage.  Nothing could be more antithetical to judicial integrity than to encourage such conduct.  Therefore, just as the *AFN* Court held, only dismissal can deter future misconduct of this sort, and provide proper relief to VMU.

### E.    VIPC's Conduct is Not Excused By the State Court Findings

In response to this motion, VIPC may argue that while it vigorously asserted the validity of the Exclusive Agreement in the New York action, and aggressively sought hundreds of thousands of dollars in royalties under the Exclusive Agreement, it ultimately received no damages.  It may assert that judicial estoppel should not apply because the judicial hearing officer at the damages inquest *sua sponte* determined that the Exclusive Agreement was "void *ab intro* [*sic*, *initio*]."  (Ex. H at 1.)  Yet, under well-established Third Circuit precedent, judicial estoppel is not contingent on the receipt of any particular judgment; it matters only what VIPC contended in the state court proceeding, "regardless of whether the court affirmatively relies on the representation."  *AFN, Inc.* 798 F. Supp. at 227 n.12; *Lewandowski*, 882 F.2d at 819.  Indeed, the damage to judicial integrity was done at the moment that a contradictory pleading was filed in the New York action, and therefore, as a policy matter, judicial estoppel should apply to these circumstances.

## IV.    NO PRECLUSIVE EFFECT SHOULD BE AFFORDED TO THE NEW YORK ACTION

If VIPC is somehow able to avoid dismissal on the basis of judicial estoppel, it may argue that the judgment it obtained in the New York Action bars this Court from considering the validity of the Exclusive Agreement (and its effects on VIPC's standing in this patent infringement suit).  This position is

16

completely at odds with established New York law.  The New York Action has *no preclusive effect whatsoever* on these proceedings.  As discussed below in Section V, when the full scope and content of the evidence is considered, it is clear that the Exclusive Agreement is valid and deprives VIPC of standing.

### A.    Legal Standards For Determining Preclusive Effect of A Prior Judgment

Federal courts should give the same preclusive effect to state court judgments that those judgments would receive in the state court which granted the judgment.  *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 (1982).  Because VIPC has introduced a judgment from New York into this proceeding, New York law governs whether it precludes relitigation of any issue.

> Collateral estoppel . . . is but a component of the broader doctrine of *res judicata* which holds that, as to the parties in a litigation and those in privity with them, a judgment on the merits by a court of competent jurisdiction is conclusive of the issues of fact and questions of law necessarily decided therein in any subsequent action.

*Gramatan Home Investors Corp. v. Lopez*, 386 N.E.2d 1328, 1331 (N.Y. 1979). Collateral estoppel is an equitable remedy with far-reaching repercussions, and therefore "strict requirements for the application of the doctrine must be satisfied [in order] to insure that a party [is not] precluded from obtaining at least one full hearing on his or her claim."  *Id.*  A party seeking to invoke collateral estoppel based on a New York judgment must satisfy two requirements: (i) the party against whom collateral estoppel is sought to be invoked was afforded a full and fair

17

opportunity to contest the earlier decision; and (ii) the issue in the prior action

identical to, and thus decisive of, that issue in the current action.  *Id.*

**B.  The State Court Judgment Is Entitled to No Preclusive Effect In This Court**

**1.  VMU Did Not Have a "Full And Fair Opportunity" To Litigate The Issues In The New York Action**

**a.  Default Judgments Are Not Entitled To Preclusive Effect**

Default judgments lack issue-preclusive effect under the doctrine of

collateral estoppel.  *See Chambers v. City of New York*, 764 N.Y.S.2d 708, 712

(App. Div. 2003) ("'An issue is not actually litigated if . . . there has been a

default.'") (ellipsis in original; citation omitted); *Watrous v. Autera*, 726 N.Y.S.2d

595, 596 (App. Div. 2001) ("Collateral estoppel may only be accorded to litigated

judgments, not to default judgments."); *United States v. DiPaolo*, 466 F. Supp. 2d

476, 484 n.9 (S.D.N.Y. 2006) ("'[T]he doctrine of collateral estoppel, or issue

preclusion, does not apply in the context of a default judgment because nothing

was actually litigated.'") (quoting 50 C.J.S. Judgments § 797(1997)); *In re Salem*,

290 B.R. 479, 484 (S.D.N.Y. 2003) (noting that "a long line of New York cases

have established that collateral estoppel is inapplicable to default judgments

because the issues have not been actually litigated").

For instance, in *Rourke v. Travelers Insurance Co.*, the New York

Appellate Division overturned the trial court's application of collateral estoppel to

18

a default judgment.  678 N.Y.S.2d 195, 196 (App. Div. 1998).  The plaintiff in

*Rourke* received a default judgment against the defendant's insured for personal

injuries suffered during a fight, and after an inquest the court entered judgment

based upon negligence.  *Id.*  The Appellate Division held that although the trial

court found that the defendant's insured was negligent, the default judgment did

not collaterally estop the defendant from arguing that the defendant's insured acted

intentionally.  *Id.*

   In this case, while VMU's Original Motion to Dismiss was pending,

VIPC filed a state court action seeking damages under the Exclusive Agreement.

After Handtrade (the other signatory to the Exclusive Agreement) failed to appear,

the New York court entered a default judgment in favor of VIPC.  (*See* Ex. F.)

There was thus no substantive adjudication of the issues and evidence concerning

the validity of the Exclusive Agreement, and therefore the default judgment

entered by the New York court can not bar this Court from independently

considering the validity of the Exclusive Agreement.

    **b.**  **The Judgment Of The Damages Inquest Is Not**
         **Entitled To Preclusive Effect**

   VIPC never questioned the validity of the Exclusive Agreement in any

pleading filed with the New York court.  Instead, VIPC sought a monetary windfall

of allegedly unpaid royalties that could be obtained if and only if the Exclusive

Agreement was validly executed.  However, based on a limited testimonial record

presented by Mr. Davidsohn at the damages inquest, a judicial hearing officer

ultimately determined that Mr. Cinotti lacked authority to enter the Exclusive

Agreement.  (Ex. H, at 1.)  The New York court then entered judgment based upon

this determination, declaring that the Exclusive Agreement is "void *ab initio* for

lack of authority on behalf of the plaintiff to enter into said Agreement" and

refusing to award any damages.  (Ex. I, at 1.)  Any argument that the inquest

produced an actual, binding judgment even though the underlying judgment is

based on default (and therefore not entitled to preclusive effect) is without merit.

Even setting aside the lack of opportunity to contest the judgment and the lack of

identity of issues, which are discussed in Section 1.c and 2., *infra*, the

determinations from the damages inquest are likewise entitled to no preclusive

effect in this Court.

         The weight of authority in New York indicates that findings from an

uncontested damages inquest cannot be used to bar VMU from litigating related

issues in this Court.  For instance, in *Robbins v. Michigan Millers Mutual

Insurance Co.*, a victim of an altercation received a default judgment against the

defendant's insured. 653 N.Y.S.2d 975, 976 (App. Div. 1997).  The plaintiff then

commenced an action pursuant to New York Insurance Law § 3420 to recover

from the insurance company on the underlying action, arguing that the defendant

insurance company was collaterally estopped from contesting the negligence of its

20

insured.  *Robbins*, 653 N.Y.S.2d at 976–77.  To support his collateral estoppel

arguments, the plaintiff highlighted that at the end of the damages inquest, the

Supreme Court concluded that the insured was actually negligent.  *Id.* at 977.  In

holding that the defendant insurance company could not be estopped from

litigating this issue, the Appellate Division noted that this finding was (i) "not

necessary to the assessment of damages" and (ii) was not "the product of an in-

depth factual analysis based on evidence adduced at trial."  *Id.*  Other New York

opinions have emphasized that the nature of a damages inquest (particularly when

the underlying action ends in default) mitigates any preclusive effect.  *See, e.g.*,

*Baxter v. Fulton Ice & Cube Co.*, 484 N.Y.S.2d 835, 838-39 (App. Div. 1985)

(rejecting the application of collateral estoppel and noting that "the 'realities of

litigation' are such that the presentation of proof on the issue of damages at an

inquest at which the defaulting party will generally be absent will rarely be as

extensive or complete as that at a trial upon which the issue of damages is

contested").

   In this case, the findings by the New York judicial officer were not

necessary to an award of damages.  Indeed, if the judicial hearing officer was not

inclined to award damages to VIPC for its default judgment, it need only have

noted that VIPC failed to prove its entitlement to monetary relief by a

preponderance of the evidence.  That is to say, it was not necessary for the New

York Court to find that Mr. Cinotti lacked authority to enter the Exclusive Agreement in order to award no damages—any number of other reasons could forestall monetary relief.  Thus, just as the finding in *Robbins* that the defendant was negligent was not necessary to the damages award, so too is any auxilliary finding regarding the authority of Mr. Cinotti.

Furthermore, VIPC did not cite any of the briefs or evidence that has been raised in this litigation, which underscores the traditional evidentiary and argumentative deficiencies inherent in a damages inquest, as the *Baxter* court observed.  Instead, VIPC offered only the testimony of Mr. Davidsohn, which contradicted his sworn affidavits and deposition testimony given in this case.  For instance, at the damages inquest, Mr. Davidsohn testified as follows:

> Q.  And did there come a time where [*sic*] you learned that the original agreement of 1999 had been amended and restated by an officer of the company?
>
> A.  Yes, I did learn about that at the -- at the last deposition I was in when I was deposed by Virgin Mobile who we have a lawsuit against right now for infringement.
> . . .
>
> Q.  Okay.  And during that litigation you learned about a – an agreement known as amended and restated license agreement with Handtrade?
>
> A.  *That's the first I've heard of it, yes.*
> . . .

Q.  Did you or any other board member in the company have knowledge that he, in fact, entered into this agreement?

A.  No, we did not.

(Testimony at Damages Inquest at 4:22–5:3, 5:12–15, 6:4–7 (attached as Ex. J) (emphasis added).)  This testimony was a far cry from the sworn affidavit Mr. Davidsohn filed in this Court.  Mr. Davidsohn swore that he knew about the Exclusive Agreement shortly after it was signed, in *September of 2000.*  He knew that Mr. Cinotti took steps to formally "ratify the Exclusive Agreement" on September 12, 2000.  (Davidsohn Aff., Docket No. 34, ¶ 44.)  He also knew that Mr. Cinotti initiated litigation in Nevada based upon the Exclusive Agreement on October 2, 2000.  (*Id.* ¶ 34.)  Furthermore, on September 13, 2000, Mr. Hankin sent a letter on Mr. Davidsohn's behalf discussing the Exclusive Agreement; Mr. Davidsohn was copied on this letter.  (Hankin Decl. Ex. B, Docket No. 35, at 1–2.)  Mr. Davidsohn's testimony at the damages inquest created the false impression that Mr. Davidsohn learned of the Exclusive Agreement only in 2007, when in reality he has known about this agreement since it was executed in 2000.  As such, the New York judicial hearing officer was left with the incorrect impression that VIPC was caught off-guard by the Exclusive Agreement; on the contrary, as Mr. Davidsohn's sworn testimony in this Court demonstrates, Mr. Davidsohn was well

aware of the fact that Mr. Cinotti entered the Exclusive Agreement on VIPC's behalf.

As another example of inconsistent testimony, Mr. Davidsohn told the New York judicial hearing officer that Mr. Cinotti is "an ex-officer of the firm." (Ex. J, at 5:22–25.)  In contrast, Mr. Davidsohn indicated during his deposition testimony in this case that Mr. Cinotti is, was, and continues to be one of VIPC's corporate officers.  (*See* Davidsohn Deposition Testimony, at 151:14–17 (attached as Ex. K).)  Again, Mr. Davidsohn's testimony appears calculated to give the New York court an incorrect picture of the events surrounding the execution of the Exclusive Agreement.

The findings of a damages inquest, particularly in connection a default judgment, are presumptively not entitled to preclusive effect.  In this case, where the relevant findings were unnecessary to the final judgment, based on an incomplete evidentiary record, and supported only by materially false testimony, these findings are entitled to no weight whatsoever.

### c. VMU Had No Opportunity To Contest The State Court Judgment

The New York default judgment and inquest findings cannot, by their very nature, be used to collaterally estop this Court from considering the validity of the Exclusive Agreement.  But even if they could, collateral estoppel may not be used against VMU, because VMU was not a party to the New York action.

24

Generally speaking, the guarantees of due process mean that "a person may not be precluded from litigating issues resolved in an action in which that person was not a party." *Gramatan Home Investors*, 386 N.E.2d at 1331. However, collateral estoppel can also bar those in privity with parties to prior action. Although privity is not easily defined in the collateral estoppel context, this term denotes "a mutually successive relationship of the same rights to the same property." *Id.* at 1332. VMU is not in a contractual relationship with Handtrade (the named defendant in the New York action) and never has been. There is no corporate association between the two parties, and their interests in the patents-in-suit or the Exclusive Agreement are unrelated. Thus, because VMU was not a party or in privity with a party to the New York action, VMU did not have a "full and fair opportunity" to contest the findings of the New York Court and cannot be collaterally estopped by any such findings.

### 2.     The Issues In The New York Action Are Not Identical To Those in This Action

The second requirement for asserting collateral estoppel—that the issues decided by the first court be identical to those in the later action—is likewise not met. Although the New York court (incorrectly) determined that the Exclusive Agreement was void "for lack of authority," it made no findings as to whether or not VIPC ratified the Exclusive Agreement by accepting the benefits conferred thereunder. As discussed in Section V.C.2, *infra*, even if a corporate representative

25

lacks the authority to *enter into* a contract on behalf of the corporation, that contract may be subsequently ratified by the corporation's acceptance of its benefits.  *See, e.g.*, *Jourdan v. Long Island R.R. Co.*, 22 N.E. 153, 154–55 (N.Y. 1889); *Irving Trust Co. v. Townsend*, 65 F.2d 406, 408 (2d Cir. 1933).

VIPC accepted substantial benefits under the terms of the Exclusive License Agreement.  VIPC had previously sued several entities, including Cisco Systems, Inc., under the '361 and '092 patents.  In accordance with the Exclusive Agreement, Handtrade brokered a settlement in this prior litigation, saving VIPC untold litigation costs and attorneys' fees.  (*See* Ex. D at § 4; Settlement Agreement with Cisco (attached as Ex. L); Press Release (attached as Ex. O); Deposition of Anthony Cinotti at 22-24 (attached as Ex. P).)  VIPC not only accepted Handtrade's assistance in brokering this settlement, but allowed Handtrade to pay its litigation costs.  (*See* Letter from John F. Mardula (attached as Ex. M); Litigation Invoice (attached as Ex. N).)  VIPC would not have received these benefits without accepting the terms of the Exclusive Agreement.  Thus, even if the damages inquest had a full, accurate, and complete evidentiary record to evaluate the nature of Mr. Cinotti's authority in August of 2000 (which it did not), the issue of whether the Exclusive Agreement was ratified was never addressed.  Thus, there is not complete identity of the issues and collateral estoppel can not apply.

Furthermore, the effect of VIPC's entire pattern of conduct, from accepting the benefits of the Exclusive Agreement, to concealing its existence in this proceeding, to misrepresenting the circumstances surrounding it in a different litigation, was most certainly not before the New York court.  Nor was the issue of how VIPC's contractual activity and judicial misconduct impact its standing to assert this action before the New York Court.  Therefore, the doctrine of collateral estoppel does not impact this Court's consideration of the Exclusive Agreement and its effects on VIPC's standing.

## V.   VIPC LACKS STANDING TO ASSERT THIS ACTION AGAINST VMU

### A.   Legal Standard For Determining Standing

Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  If a plaintiff lacks standing, the district court lacks proper subject matter jurisdiction over the suit.  *See, e.g.*, *Ballantine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (noting that a standing argument implicates Fed. R. Civ. P. 12(b)(1)).  Objections to standing defects are not waived if they are not asserted in a defendant's Answer; whenever lack of standing is discovered, it is cause for dismissal.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1325, 1328 (Fed. Cir. 2001) (affirming

27

dismissal of a patent infringement action on a summary judgment motion made after defendants first learned of plaintiff's lack of standing during discovery).

The ultimate burden of proof on a motion for summary judgment dismissal based upon lack of standing rests with the plaintiff.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).  The plaintiff must affirmatively support each element of constitutional and prudential standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (citations and quotations omitted); *accord Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Thus, in order to properly invoke federal jurisdiction, VIPC must satisfy both the constitutionally imposed "case-or-controversy requirement," as well as the judicially created requirements of "prudential standing."  *Elk Grove Unified Sch. Dist. v. Newow*, 542 U.S. 1, 11–12 (2004).  Among other things, the "case-or-controversy" requirement of Article III of the U.S. Constitution requires that plaintiff has "suffered an 'injury in fact,'" which is the "invasion of a legally protected interest."  *Lujan*, 504 U.S. at 560.  Prudential standing, on the other hand, encompasses "the general prohibition on a litigant's raising another person's legal rights."  *Elk Grove*, 542 U.S. at 12 (internal quotations and citation omitted).

A patentee lacks standing when it has divested itself of any enforcement rights.  For instance, in *Lans v. Digital Equipment Corp.*, the Federal Circuit affirmed the district court's dismissal of a patent infringement suit for lack of standing when the plaintiff, Lans, lacked the right to assert the patent-in-suit. 252 F.3d 1320, 1324 (Fed. Cir. 2001).  During discovery, documents obtained from a third-party subpoena indicated that Lans had assigned his proprietary and enforcement rights to the patent-in-suit to another entity as part of a licensing scheme.  *Id.* at 1324–25.  Although Lans argued that his prior contracts were "invalid," the court rejected this argument in light of the plain language of the relevant agreements, which expressly provided that the right to sue for patent infringement was vested with an entity other than Lans.  *Id.* at 1324–25, 1328. Moreover, the court noted that Lans failed to disclose the existence of these prior, case-dispositive agreements, and therefore concluded that his "personal choices occasioned his standing problems." *Id.* at 1328.

Similarly, in *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, the Federal Circuit concluded that an exclusive license, which also included the right to sue for patent infringement, deprived all other entities of the right to assert infringement of that patent, including the patent owner.  944 F.2d 870, 873–75 (Fed. Cir. 1991)  In that case, the patent owner, Marowsky, had given an exclusive license to use the asserted patent, along with "the rights to sue for past,

29

present and future infringements of the [asserted patent]," provided that the patent owner was notified of the licensee's intention to file such a suit. *Id.* at 874.   Under these circumstances, the court determined that "the right to sue rested solely with the [licensee.]" *Id.* at 875–76.

### B.   The Exclusive Agreement Deprives VIPC Of Standing

On August 10, 2000, VIPC and Handtrade entered the Exclusive Agreement, which was signed by a corporate officer, acting with full authority to enter into binding contracts on VIPC's behalf.  (*See* Ex. D.)  The Exclusive Agreement expressly grants to Handtrade an exclusive and transferable license to all rights to the patents-in-suit, as well as the exclusive and transferable right to grant sublicenses under these patents.  More importantly, VIPC also transferred and assigned to Handtrade "any and all causes of action, rights, and remedies arising under the Patents."  (Ex. D § 4, ¶ 1.)  Handtrade acquired "complete control over the management and handling of any actions, civil actions, lawsuits, litigation, administrative actions, quasi-judicial actions, as well as prosecutions and related activities for or regarding any of the patents or patent applications covered by this Agreement."  (*Id.*)  VIPC retained no independent right to assert infringement of the '092 and '361 patents by itself; it could only join litigation "if required by law."  (*Id.* ¶ 4.)

30

This exclusive grant of authority could not be clearer.  Handtrade, and only Handtrade, possessed the right to initiate an infringement action based upon the '092 and '361 patents when this suit was brought.  VIPC could have retained some control over the right to sue under these patents, but affirmatively chose not to do so.  VIPC intended to give away its proprietary enforcement rights to these patents, and did precisely that.  Thus, because the only "legally protected interest" that could be "invaded" did not belong to VIPC, VIPC lacked constitutional standing to bring this lawsuit.  *See Lujan*, 504 U.S. at 560.

VIPC's actions also eliminated its prudential standing.  Just as the patentee in *Lans* transferred its enforcement rights to another entity, and lost prudential standing to assert the patents-in-suit, so too did VIPC transfer its enforcement rights.  Just as the exclusive licensee in *Vaupel* gained the "sole right to sue" for patent infringement, so too did Handtrade gain the sole right to sue for infringement of the '092 and '361 patents.  A lack of *either* prudential or constitutional standing would be require dismissal of this lawsuit, and VIPC lacked both.

## C.   The Exclusive Agreement Is Valid

VIPC has done everything possible to prevent this Court from substantively considering the effect of the Exclusive Agreement on VIPC's standing.  VIPC concealed the Agreement's existence from the outset, when it

31

failed to produce it as part of its initial disclosures, as required by the Federal Rules of Civil Procedure, and then when it gave incomplete and misleading responses to legitimate and specific discovery requests.  Now, VIPC argues that because it received a default judgment in New York state court, that the Exclusive Agreement is invalid and presents no standing defect.  (Docket Nos. 78–80.)  The only explanation for VIPC's pattern of conduct is that it knows that once this Court considers the objective, irrefutable record evidence that VMU has raised, this Court will conclude that the Exclusive Agreement is valid and deprives VIPC of standing.  There are two key reasons that the Exclusive Agreement is valid: (i) it was executed by an officer of VIPC with full authority to do so; and (ii) VIPC ratified the Agreement by accepting substantial benefits under its terms.

### 1.    Anthony Cinotti Had Full Authority To Enter the Exclusive Agreement

On August 10, 2000, Anthony Cinotti entered into the Exclusive Agreement on behalf of VIPC.  The validity of the Exclusive Agreement hinges in part on whether Mr. Cinotti had the authority to do so.  Mr. Cinotti possessed the requisite authority to enter the Exclusive Agreement by virtue of his: (i) position as VIPC's secretary and treasurer; (ii) position as co-chairman of VIPC's Board of Directors; and (iii) prior course of conduct on VIPC's behalf.  Under New York law, any one of these three bases would by itself be sufficient to confer authority to enter the Exclusive Agreement; taken in the aggregate, they conclusively establish

that Mr. Cinotti properly and validly executed the Exclusive Agreement, thereby

binding VIPC to its terms and repercussions.

### i.    Mr. Cinotti Was VIPC's Secretary and Treasurer

"'The president *or other general officer* of a corporation has power,

*prima facie*, to do any act which the directors could authorize or ratify.'" *Odell v.*

*704 Broadway Condo.*, 728 N.Y.S.2d 464, 468-69 (App. Div. 2001) (emphasis

added) (quoting *Hastings v. Brooklyn Life Ins. Co.*, 34 N.E. 289, 291 (N.Y. 1893)).

The New York Court of Appeals has "placed the [corporate] secretary within the

category of general officers whose authority is presumed to be as broad as that of

the president himself." *Traitel Marble Co. v. Brown Bros., Inc.*, 144 N.Y.S. 562,

564 (App. Div. 1913) (citing *Hastings*, 34 N.E. at 291); *see also Trimline Window*

*Frame, Inc. v. Rural New Yorker, Inc.*, 168 N.Y.S.2d 170, 172 (Sup. Ct. 1957)

(holding that the secretary of the defendant corporation had authority to execute a

binding guaranty on its behalf).

At the last undisputed corporate election VIPC held prior to the

execution of the Exclusive Agreement, Mr. Cinotti was VIPC's corporate secretary.

(Ex. J, at 3; Davidsohn Aff., Docket No. 34 at 177:9–10.)  Although Mr.

Davidsohn attempted to oust Mr. Cinotti from his positions at VIPC, he was

unsuccessful, and therefore Mr. Cinotti and Mr. Davidsohn retained their "status

quo position[s] regarding control of the corporation"—namely, Mr. Davidsohn

33

retained the presidency, and Mr. Cinotti remained VIPC's secretary and treasurer. (*See* Davidsohn Aff., Docket No. 34, ¶¶ 43-44.)  Indeed, VIPC's evidence shows that the first valid, subsequent election for VIPC's corporate officers occurred on April 12, 2004—nearly four years after the Exclusive Agreement was executed. (*See* Davidsohn Aff., Docket No. 34, ¶ 24.)  In other words, at the time he executed the Exclusive Agreement, Mr. Cinotti was one of the "general officers" of VIPC that under New York law have authority to enter binding agreements on its behalf.

### ii.    Mr. Cinotti Was Co-Chairman Of VIPC's Board of Directors

A chairman of a corporate board of directors is recognized under New York statutory law and accepted "for certain purposes as an alternative to the presidency" as a way to "divid[e] up between two relatively equal principals the control of the corporation."  *American Express Co. v. Lopez*, 340 N.Y.S.2d 82, 83–84 (Civ. Ct. 1973).

Mr. Cinotti was a Chairman of VIPC's Board of Directors in 2000. (Davidsohn Aff., Docket No. 34, ¶ 29.)  Neither Mr. Davidsohn nor VIPC's shareholders ever removed Mr. Cinotti from his position at the helm of VIPC's Board of Directors.  Indeed, as Mr. Davidsohn conceded in his deposition, Mr. Cinotti *still* sits on VIPC's Board of Directors, more than seven years after the Exclusive Agreement was executed.  (*See* Ex. K, at 151:14–17.)  Although Mr. Cinotti's position as VIPC's Secretary is sufficient by itself to confer authority to

34

enter the Exclusive Agreement, his additional position as a Chairman of the Board of Directors confirms this grant of authority.

### iii.   Mr. Cinotti Had Extensive Prior Dealings With Handtrade And Other Entities

In response to this motion, VIPC will undoubtedly introduce evidence of a series of internal struggles and maneuvers concerning VIPC's corporate structure during 2000.  This evidence is entirely irrelevant to this motion, and is an attempt merely to further confuse a straightforward inquiry.  It is especially irrelevant given Mr. Davidsohn's admission that not only did Mr. Cinotti hold multiple positions of authority in August of 2000, but he continues to remain on VIPC's Board *to this day*.  (Ex. K, at 151, ll. 14–17.)  Yet, even if Mr. Cinotti held no formal position with VIPC, his course of prior dealings with Handtrade and others confers sufficient authority upon him to enter the Exclusive Agreement.

The authority of a corporate representative to act may be established through a prior course of conduct.  *See, e.g.*, *Hubbard v. Syenite Trap Rock Co.*, 165 N.Y.S. 486, 487 (App. Div. 1917) (noting that authority of a corporate treasurer to contractually bind the corporation may "be implied from a prior course of dealing"); *Ernst v. Cary Safe Co.*, 185 N.Y.S. 168, 170 (Sup. Ct. 1920) (stating that a corporate representative's power to act on its behalf may be "'implied from a habit or custom of doing business'") (citation omitted), *rev'd on other grounds*, 200 N.Y.S. 921 (App. Div. 1923).  In this context, the third party contracting with

the corporation must have a reasonable basis for relying on the corporate representative's purported authority to execute an instrument.  *Hallock v. State*, 474 N.E.2d 1178, 1181 (N.Y. 1984).

Mr. Cinotti had previously negotiated with Handtrade and signed the predecessor license that was modified by the Exclusive Agreement, so it was certainly reasonable to believe that he continued to possess sufficient authority to enter contracts on VIPC's behalf.  (Letter Agreement with Handtrade at 7 (attached as Ex. R).)  Indeed, Cinotti managed VIPC's day-to-day affairs, and supervised VIPC's merger with Neurotek, a critical part of VIPC's corporate development. (Ex. K, at 177: 9–21.)  But Mr. Cinotti's role went beyond daily affairs or merger management—he "entered contracts on behalf of VIPC . . ., conducted the financial affairs of the corporation, including banking, the signing of checks and promissory notes, [and] executed leases and loan agreements on behalf of the corporation."  (Nicoletti Letter at 2 (attached as Ex. S).)

It is entirely reasonable for Handtrade to have assumed that an individual who manages a corporation's daily financial and business affairs, frequently signs on its behalf, and is generally vested with the authority to bind the corporation in a myriad of transactions and circumstances, was acting in a similar capacity when signing the Exclusive Agreement.  Based on this "habit or custom" of conducting VIPC's business, as well as the "prior course of dealing" with

36

Handtrade in particular, Mr. Cinotti was clothed with implied authority to enter the Exclusive Agreement. *See Ernst*, 185 N.Y.S. at 170; *Hubbard*, 165 N.Y.S. at 487.

### 2.    VIPC Ratified The Exclusive Agreement

No ratification was necessary in order to validate the Exclusive Agreement, because Mr. Cinotti was acting under valid authority when he executed the Exclusive Agreement on VIPC's behalf. *See Chem. Bank Affiliated FM Ins. Co.*, 196 F.3d 373, 375 (2d Cir. 1999) (applying N.Y. law) (noting that "[a]lthough a ratified act is given effect as if originally authorized, . . . ratification is in no way implicated where an agent acts with authority, actual or apparent"), *vacated on other grounds sub nom. Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120 (2d Cir. 2003). However, VIPC nonetheless ratified the Exclusive Agreement by accepting the benefits Handtrade conferred. As a result, there is yet another separate and independent basis to find that the Exclusive Agreement is valid.

Under New York law, a party ratifies a contract that would otherwise have required express affirmation by accepting its benefits. *See, e.g.*, *Jourdan*, 22 N.E. at 154-55; *Irving Trust*, 65 F.2d at 408; *Mulitex USA, Inc. v. Marvin Knitting Mills, Inc.*, 784 N.Y.S.2d 506, 507 (App. Div. 2004) (noting that acceptance of even partial payment under a contract entered into without express authority is sufficient to ratify the contract and bind the principal corporation); 57 N.Y. Jur. 2d Estoppel, Ratification & Waiver, § 76 (1986) ("Acquiescence may give rise to an

37

implied ratification, as where one's conduct subsequent to the transaction

complained of supports the conclusion that he has . . . accepted and adopted it.")

      VIPC accepted substantial benefits under the Exclusive Agreement,

and took absolutely no action to repudiate or invalidate it.  Not only did Handtrade

pay substantial litigation costs on VIPC's behalf in a prior patent infringement suit,

but it also brokered a settlement agreement, in accordance with the terms of the

Exclusive Agreement and at VIPC's behest, thus saving VIPC untold court costs

and attorney fees.  (*See* Settlement Agreement with Cisco (attached as Ex. L);

Letter from John F. Mardula (attached as Ex. M); Litigation Invoice (attached as

Ex. N); Press Release (attached as Ex. O); Deposition of Anthony Cinotti at 22-24

(attached as Ex. P).  Thus, although no ratification was required, VIPC's willing

acceptance of its benefits ratified the Exclusive Agreement.

## VI.    WHATEVER THE EFFECT OF THE NEW YORK JUDGMENT, IT CANNOT CONFER STANDING

      VIPC could have taken any number of actions prior to initiating this

lawsuit that would have permitted it to acquire the right to sue for infringement of

the patents-in-suit, but it affirmatively chose to file first, and risk that VMU would

later discover its standing defects.  As noted above, VIPC has explicitly argued in

New York state court that the Exclusive Agreement is valid.  Because it admits that

the Exclusive Agreement is valid, VIPC concedes that it was in effect at the start of

this litigation, meaning that on May 20, 2005, it lacked the right to bring this lawsuit because it had assigned its right to do so to another entity. This chain of events is fatal to VIPC's infringement claims.

Standing to sue for patent infringement is determined by the rights held by the plaintiff on the date on which suit was filed. *See Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 779–80 (noting that "parties should possess rights before seeking to have them vindicated in court," and ordering dismissal of a complaint for infringement with prejudice after determining that the plaintiff lacked the right to enforce the patents as of the date that suit was filed) (citation omitted); *see also Minneapolis & St. Louis R.R. Co. v. Peoria & Pekin Union Ry. Co.*, 270 U.S. 580, 586 (1926) ("The jurisdiction of the lower court depends upon the state of things existing at the time the suit was brought."). It is therefore not possible for a plaintiff to resolve a standing defect by retroactively acquiring essential rights that had been lacking on the date suit was initiated. *See Gaia Techs.*, 93 F.3d at 779–80.

Just as the *Gaia Technologies* court ordered dismissal of an infringement complaint with prejudice when the plaintiff lacked standing on the date the suit was initiated, so too should this Court dismiss this case. Even if the state court judgment is viewed as "retroactively" voiding the Exclusive Agreement,

39

this retroactive effect simply comes too late, especially when coupled with VIPC's

other inappropriate conduct.

## CONCLUSION

The Exclusive Agreement is valid, either because Mr. Cinotti had

authority to act on VIPC's behalf or because it was later ratified.  As a result, the

Exclusive Agreement deprives VIPC of standing to pursue this litigation.  And

VIPC's pattern of concealment, blatant self-contradiction, and shifting arguments

demonstrates that it has acted with the worst sort of bad faith, and therefore VIPC

should be judicially estopped from maintaining this action.  VIPC has no one to

blame but itself for its actions, which are not only fatal to this lawsuit, but have

also undermined the integrity of the judicial process.  For all of the foregoing

reasons, VMU respectfully requests that this Court dismiss VIPC's Complaint with

prejudice and award VMU its reasonable attorneys' fees and costs.

Dated: February 22, 2008                Respectfully submitted,

                                        _s/ Cynthia V. Fitzgerald_
                                        Cynthia V. Fitzgerald
                                        Daniel A. DeVito
                                        Marti A. Johnson
                                        SKADDEN, ARPS, SLATE
                                           MEAGHER & FLOM LLP
                                        Four Times Square
                                        New York, New York 10036-6522
                                        (212) 735-3000
                                        Attorneys for Defendants and Counterclaim-
                                              Plaintiffs, Virgin Mobile USA, LLC

40